**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING**

**BERNARD M. MORRISEY,**

      **Plaintiff,**

**v.**                                     **Civil Action No.: 5:10-CV-84
JUDGE STAMP**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

      **Defendant.**

**REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE RECOMMENDING
THAT THE DISTRICT COURT GRANT IN PART AND DENY IN PART PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT [12], DENY DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT [13], AND REMAND WITH INSTRUCTIONS**

## I.  INTRODUCTION

On August 18, 2010, Plaintiff Bernard M. Morrisey ("Plaintiff"), by counsel Louis H. Khourey, Esq., filed a Complaint to obtain judicial review of the final decision of Defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g).  (Complaint, ECF No. 1)  The case was referred to this Court to issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and LR Civ P 9.02(a).  28 U.S.C. § 636(b)(1)(B); N.D.W.V. LR Civ P 9.02(a).  On October 19, 2010, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an Answer and the Administrative Record of the proceedings.  (Answer, ECF No.

8; Administrative Record, ECF No. 9)  On November 5, 2010, the Plaintiff filed his Motion for

Summary Judgment.  (Pl's Motion, ECF No. 12)  On December 6, 2010, the Commissioner filed his

Motion for Summary Judgment.  (Def.'s Motion, ECF No. 13)  Following review of the motions by

the parties and the administrative record, the undersigned Magistrate Judge now issues this Report

and Recommendation to the District Judge.

## II.  BACKGROUND

A.    **Procedural History**

1.    Plaintiff's First Application For Disability Insurance Benefits

On March 18, 2005, the Plaintiff filed concurrent applications for Disability Insurance

Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 et seq., and Supplemental

Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381 et seq.  (R.

at 65)  These claims were denied at the initial level on July 6, 2005, and the Plaintiff did not appeal

those determinations.[1]  Id.

2.    Plaintiff's Present Application for Disability Insurance Benefits

On October 5, 2006, the Plaintiff filed a second SSI claim alleging disability beginning

August 1, 2002.  (R. at 107-109)  The Plaintiff's second claim was initially denied on January 26,

2007, and denied again upon reconsideration on April 6, 2007.  (R. at 60-61)  On April 24, 2007,

---

[1] In his decision denying the Plaintiff's present SSI claim, the ALJ found that there was
no cause for reopening these prior claims.  (R. at 65)  The ALJ's decision not to reopen the
previous determinations is not reviewable by this Court.  See Califano v. Sanders, 430 U.S. 99,
108 (1977) ("[Section 405(g)] cannot be read to authorize judicial review of alleged abuses of
agency discretion in refusing to reopen claims for social security benefits.").

the Plaintiff filed a written request for a hearing, which was held before an ALJ on May 1, 2008, in Wheeling, West Virginia. (R. at 10-59, 82) On August 1, 2008, the ALJ issued an unfavorable decision to the Plaintiff, finding that he had not been under a disability within the meaning of the Social Security Act Since October 5, 2006, the date the application was filed. (R. at 62-72) On June 24, 2010, the Appeals Council denied the Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. at 1-5) The Plaintiff now requests judicial review of the ALJ decision denying his application for SSI.

**B.** <u>**Personal History**</u>

Plaintiff Bernard M. Morrisey was born on April 28, 1956, and was 50 years old at the time he applied for SSI. (<u>See</u> R. at 107) The Plaintiff is a high school graduate and completed three years of study at Marshall University. (R. at 20-21) The Plaintiff worked as a sales manager and financial consultant for several hospitals and medical laboratories until he was injured in a car accident on August 30, 2001. (R. at 21-29, 71, 173) The Plaintiff is divorced and has two children. (R. at 16-17, 107)

**C.** <u>**Relevant Medical History**</u>

On January 22, 2002, the Plaintiff visited Dr. Joseph C. Maroon, M.D., of Tri-State Neurosurgical Associates, UPMC, for treatment of severe right forearm pain and right hand numbness. (R. at 173) The Plaintiff's claimed medical conditions relate back to August 30, 2001, when he was involved in a car accident. <u>Id.</u> According to the Plaintiff, he developed severe right forearm pain and right hand numbness after the accident, and was diagnosed with an irritated nerve.

Id.  He was prescribed physical therapy, and other treatments such as traction and electrical stimulation were employed, but the Plaintiff claims that these treatment modalities provided only temporary relief of his symptoms.  Id.  Although the Plaintiff ambulated well at the time of the consultation, motor strength testing revealed marked weakness to the right triceps muscle, and reflex testing revealed an absent right triceps muscle reflex.  (R. at 174)  Based on the Plaintiff's subjective complaints and his own clinical findings, Dr. Maroon recommended surgery.  Id.

On February 7, 2002, the Plaintiff underwent a microdiskectomy and interbody fusion of his C6-7 vertebrae, performed by Dr. Joseph Maroon at Presbyterian University Hospital, UPMC Health System, in Pittsburgh, PA.  (R. at 170-171)  The Plaintiff was given a preoperative diagnosis of cervical spondylosis and herniated disc of the C5-6 vertebrae, and severe C7 radiculopathy.  (R. at 170)  His postoperative diagnosis was unchanged.  Id.

On March 26, 2002, Dr. Maroon examined the Plaintiff for a post-operative checkup, noting that although the Plaintiff had mild complaints of voice hoarseness, he denied any right upper extremity pain and overall felt better compared to before the surgery.  (R. at 172)  The Plaintiff was able to ambulate with a steady gait, his surgical incision was well healed, and his motor strength had improved.  Id.  The Plaintiff reported returning to work without complications.  Id.  Overall, Dr. Maroon was pleased with the Plaintiff's progress and prescribed four weeks of physical therapy.  Id.

On January 4, 2007, the Plaintiff was examined by Dr. Gabriel Sella, M.D., for a disability determination examination, complaining of a broken neck, complications from an injury sustained

in a vehicle accident, and chronic pain in the neck and upper back/shoulders. (R. at 178) Dr. Sella noted that the Plaintiff's back-straight to back-flexed showed minimal reduction in span, but that grip testing was severely reduced in the right upper limb, key pinch was severely reduced in the right upper limb, and double scale weighing showed that the Plaintiff puts 30-40% more weight on the left lower limb. Id. Dr. Sella described the Plaintiff as a pleasant gentlemen who was quite depressed, noting that his mood and affect showed depression. (R. at 179) The Plaintiff's neck had a normal appearance, but a reduced range of motion. Id. The Plaintiff had motor deficits in the right upper limb, with possible deficit in the right C5-6 and C7. (R. at 180) Although he walked in and out of the room without difficulty, and got on and off the examination table without difficulty, his Romberg, tandem walk, toe walk, and heel walk were all positive. Id. His posture was abnormal from the neck, which was moved forward in a flexed position and had a very poor range of motion. Id. Dr. Sella described the Plaintiff's neck symptoms as postsurgical, stating that, after the surgery, he has had chronic pain and very poor range of motion. Id. His chronic pain and reduced range of motion make it difficult for the Plaintiff to drive, and also make it difficult to rotate and bend the neck. Id. Dr. Sella opined that the Plaintiff's neck fracture, surgery, and complications have limited his ability to work to the following: "he can sit. He can stand occasionally and walk occasionally. He cannot carry almost anything in his right upper limb. He can handle light objects only with his right upper limb. He can speak, hear, and travel, though he cannot drive himself." Id.

On January 24, 2007, Dr. Cynthia Osborne, D.O., completed a physical residual functional capacity ("RFC") assessment of the Plaintiff, finding as a primary diagnosis chronic cervical strain

with a history of a motor vehicle accident. (R. at 183) Dr. Osborne found that the Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and could push or pull without limitation other than as shown for lifting and carrying. (R. at 184) The Plaintiff could occasionally climb ramps/stairs, never climb ladders/ropes/scaffolds, frequently balance, and occasionally stoop, kneel, crouch, and crawl. (R. at 185) The Plaintiff had no manipulative, visual, or communicative limitations. (R. at 186-187) The Plaintiff was to avoid concentrated exposure to extreme cold and hazards, but had no other environmental limitations. (R. at 187) Dr. Osborne noted that the Plaintiff's daily activities included light housekeeping and cooking, changing his cat's litter box, and monthly grocery shopping. (R. at 190) Dr. Osborne found that the Plaintiff appeared to be credible, and her findings supported a decrease in the Plaintiff's RFC to light with limitations as indicated in the assessment. Id.

On February 20, 2007, the Plaintiff visited Wheeling Health Right for a new patient evaluation. (R. at 224) Richard Amesquita, a medical student physician assistant, evaluated the Plaintff. Id. Mr. Amesquita found that the Plaintiff had 3/5 strength on his right side, and that his neck was fixed at 15 degrees with no side bending and minimal rotation. (R. at 225) The Plaintiff was diagnosed with benign essential hypertension. (R. at 226)

On March 6, 2007, the Plaintiff visited Wheeling Health Right for a blood pressure check and review of lab results from blood samples taken on February 22, 2007. (R. at 222) The Plaintiff complained of neck pain and pain in his right shoulder and right arm. Id. He stated that he no

longer had feeling in his fingers, had lost strength and function in his right hand, and had to shake hands with his left hand. Id. He requested an evaluation for physical therapy, which he stated was helpful in the past. Id. A request for physical therapy evaluation and treatment was submitted by Brandon Greiner, a medical student physician assistant. (R. at 223)

On March 14, 2007, the Plaintiff was evaluated for physical therapy by Matthew Bechtel, PT, of the Ohio Valley Medical Center Physical Therapy Department. (R. at 275-276) The Plaintiff reported to Mr. Bechtel that he suffered from progressive decreased range of movement and pain in the neck and right arm, and Mr. Bechtel's impressions were a cervical fracture with moderate to severe stenosis on the right side, radiculopathy in the right upper extremity, and more pronounced C6-7 radiculopathy. Id. Mr. Bechtel conducted some physical therapy on the Plaintiff's neck and right shoulder, and recommended an additional 8 weeks of therapy. (R. at 276) The Plaintiff was seen for physical therapy a total of 27 times from March 14, 2007, to July 19, 2007. (See R. at 248-276) Physical therapy notes from visits in March and April indicate that the Plaintiff was benefitting from physical therapy, with the therapist noting that the Plaintiff was improving, although slowly, and felt better overall. (R. at 260-270) However, treatment was discontinued on October 16, 2007, after the Plaintiff stopped showing up for therapy on July 26, 2007. (R. at 248)

On March 20, 2007, the Plaintiff visited Wheeling Health Right for a 1 month followup on X-Rays, physical therapy, and a blood pressure recheck. (R. at 220) The Plaintiff reported that he went to physical therapy three times over the previous week but found it helped only a little bit. Id. The report from the physical therapist showed that the Plaintiff had a fair prognosis and they would

continue to work with him three times a week for eight weeks. Id. The Plaintiff's C-spine X-Ray showed moderate degenerative changes, an osteophyte, and right side carotid artery stenosis. (R. at 220, 228) The Plaintiff reported that he was beginning to be unable to deal with the pain, that he would like something to take the edge off, and would like to be referred to a neurosurgeon for evaluation and possible surgery. (R. at 220) The Plaintiff was prescribed baby aspirin for his possible stenosis, was instructed to continue physical therapy, and an ultrasound of the Plaintiff's arteries was scheduled. (R. at 221)

On March 28, 2007, the Plaintiff visited Wheeling Health Right for neck pain. (R. at 219) Registered Nurse Mary J. Meador's report states that Mr. Bechtel, the Plaintiff's physical therapist, reported that the Plaintiff had completed 7 visits and was showing little improvement.[2] (R. at 219) Her report further states that Mr. Bechtel planned to discharge the Plaintiff from physical therapy and recommend a neurosurgical consultation. Id.

On April 5, 2007, Dr. Subhash Gajendragadkar, M.D., completed a physical RFC assessment of the Plaintiff, finding a primary diagnosis of chronic cervical spine pain with a history of neck injury, as well as a secondary diagnosis of degenerative joint and degenerative disc disease of the cervical spine as a result of a motor vehicle accident. (R. at 205) Dr. Gajendragadkar determined that the Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and push or pull without limitation other than as shown for lifting and carrying. (R. at 206) Dr. Gajendragadkar

---

[2] Mr. Bechtel's progress notes from visits subsequent to March 28, 2007, show that the Plaintiff's condition was improving and that he felt better overall. (R. at 260-268)

found that the Plaintiff could occasionally climb ramps/stars, never climb ladders/ropes/scaffolds, could frequently balance, and could occasionally stoop, kneel, crouch, and crawl. (R. at 207) Dr. Gajendragadkar found no manipulative, visual, or communicative limitations. (R. at 208-209) Dr. Gajendragadkar found that the Plaintiff should avoid even moderate exposure to extreme cold, concentrated exposure to vibration, and even moderate exposure to hazards, but no other environmental limitations. (R. at 209) Dr. Gajendragadkar noted that the Plaintiff reported some limitations in his daily activities due to his physical condition, particularly with personal care and driving. (R. at 210) The Plaintiff reported caring for his pet, cooking daily, doing some minor cleaning and very minor chores, traveling daily by walking, shopping monthly for groceries, and reading/watching TV. Id. Dr. Gajendragadkar found that although the evidence of record established a basis for a degree of pain and limitation, it was not of the disabling degree alleged by the Plaintiff, and therefore found the Plaintiff to only be partially credible. Id.

On April 9, 2007, a carotid duplex scan was performed on the Plaintiff by Dr. Rjai T. Khoury, M.D., of the Cardiac Neuro Vascular Center at Wheeling Hospital, finding the Plaintiff's right and left carotid arteries to have normal velocities, minimal plaque formation, and patent with antegrade flow. (R. at 213-214) Dr. Khoury's impressions were smooth plaque in both bulb areas without significant stenosis, patent vertebral arteries, and symmetrical brachial pressures. Id.

On April 17, 2007, the Plaintiff visited Wheeling Health Right for a followup blood pressure check. (R. at 239) An MRI of the Plaintiff's cervical spine was scheduled. Id.

On June 19, 2007, the Plaintiff was evaluated by Dr. James L. Comerci, M.D., of Wheeling

Hospital Radiology. (R. at 238) A cervical MRI was performed, which showed spurring and disc protrusion at the C5-6 level, causing central and left lateral recess stenosis. Id. The MRI also showed postoperative changes at the C6-7 level. Id.

On September 6, 2007, the Plaintiff visited Wheeling Health Right for followup testing, complaining of constant neck pain, tingling in the right arm, and decreased right arm strength. (R. at 236) The Plaintiff was referred to the WVU spinal center for treatment. (R. at 236)

On November 20, 2007, the Plaintiff visited Wheeling Health Right for a refill of his medication. (R. at 233) The examining medical student, Paul Scurti, noted that the Plaintiff continued to complain of chronic neck pain. Id.

On December 28, 2007, the Plaintiff was administered an electromyography ("EMG") scan by Dr. Srini Govindan, M.D., of Wheeling Hospital to test the nervous system of his upper extremities. (R. at 241-242) Dr. Govindan determined that the Plaintiff suffered from carpal tunnel syndrome median nerve neuropathy on his right upper extremity and bilateral ulnar neuropathy. (R. at 242)

On February 11, 2008, the Plaintiff visited the WVU Hospital Spine Center for a specialist consultation, and was examined by Dr. Beverly Epstein, M.D. (R. at 243) Dr. Epstein diagnosed the Plaintiff with C6-7 radiculopathy status post surgery, post-laminectomy syndrome of the cervical spine, right ulnar neuropathy and carpal tunnel syndrome on the right, neurogenic pain, and cervicalgia. (R. at 244) As to the diagnosis of right ulnar neuropathy and carpal tunnel syndrome, Dr. Epstein noted that this diagnosis was made on the basis of the Plaintiff's previous EMG results,

which she questioned, believing that the Plaintiff might have double crush syndrome instead.  Id.
Dr. Epstein prescribed Lyrica or, if unavailable, Neurontin for the Plaintiff's pain, and recommended
home exercise.  Id.  Dr. Epstein also instructed the Plaintiff to stop leaning on his elbows, stop
chewing gum, and stop smoking.  Id.

On March 24, 2008, the Plaintiff was admitted to the Ohio Valley Medical Center
Emergency Room with complaints of rectal bleeding and diarrhea.  (R. at 278)  The Plaintiff stated
that he "was on a business trip and on the way back he ate at a Cracker Barrel.  He then had diarrhea
with rectal bleeding that night."  Id.  He informed Dr. Christopher Gooch, D.O., that "[h]e does work
as a consultant with business development.  He is self-employed."  (R. at 285)  The Plaintiff
underwent a colonoscopy, and also underwent an upper extremity doppler after developing swelling
and tenderness in his right arm.  (R. at 279)  The Plaintiff's bleeding eventually stopped, and he was
discharged home on March 28, 2008.  (R. at 278-279)

**D.**     **Psychological Evidence**

On April 5, 2007, Dr. G. David Allen, Ph.D., completed a psychiatric review technique
finding no medically determinable impairment.  (R. at 191)  Dr. Allen noted that the Plaintiff
presented himself very well over the phone, made no psychological allegations, and reported no
psychiatric diagnoses, treatments, or prescriptions.  (R. at 203)  Dr. Allen stated that the Plaintiff's
daily activities appear to be limited due to physical complaints only.  Id.

**E.**     **Testimonial Evidence**

At the ALJ hearing held on May 1, 2008, the Plaintiff testified that he has no income,

currently receives food stamps, and has lived in recent years by liquidating his assets and borrowing money from friends or relatives. (R. at 20) In 2002, he received a settlement of approximately $20,000 for injuries sustained in a car wreck in August 2001. (R. at 21-22) He last worked full-time in 1998 as a sales rep for Norax laboratories in Maine, but did some part-time work in 2000 as a sales rep for a friend's chiropractic firm. (R. at 23) The Plaintiff also attempted to start a financial advising service in 2001 by soliciting customers to purchase trust funds prepared by Nationwide insurance, but this enterprise was short-lived and unsuccessful. (R. at 24-25) Prior to working for Norax in 1998, the Plaintiff worked as a sales rep for Corning Clinical Laboratories, Medical Management Systems, and Procure Manufacturing Company. (R. at 26-29) Although he has been out of work for several years, he has looked for employment in sales and marketing. (R. at 50-51) He has not, however, received an interview for a position, and he believes that his age and medical issues have contributed to his lack of success in finding employment. (R. at 51)

The Plaintiff testified that he is 6'1" tall, weighs roughly 208 pounds, and that his weight has remained within a 10 pound range over the past year. (R. at 16) He was in a car accident in August 2001 which broke a vertebra in his neck, resulting in nerve pain and weakness in his right arm and hand. (R. at 21, 30-31, 36) Surgery helped relieve his symptoms, but physical therapy has been unsuccessful. (R. at 31-33) He is right-handed, but due to his neck and arm problems he can neither type nor write with that hand – he can only sign papers, and he does so with some trouble. (R. at 16, 38-39) Any typing that he does is done with the left hand, and only through "hunt and peck" of the keys. (R. at 38-39) He can raise his right arm, but has trouble doing so if he raises it to the side

as opposed to straight in front. (R. at 37-38) He can pick up a milk jug with his right hand, and can lift more with his left, but if he lifts too much on the left he gets pain across his shoulders and into his right arm. (R. at 42) He can dress himself, and can put on pull-over golf shirts despite his arm trouble. (R. at 45) He can walk the length of his street, and estimates that he can walk around 15 minutes without having to take a break, but walking on uneven ground, such as a hiking trail, is difficult and causes pain. (R. at 40, 43) He can stand in one place and work for 15-20 minutes at a time. (R. at 41) He can sit in one place, but becomes uncomfortable if he cannot adjust his position at intervals. (R. at 41-42)

John M. Panza, a vocational expert, also testified at the ALJ hearing on May1, 2008. (R. at 52) Mr. Panza agreed with the ALJ's assessment that the vocational evidence of record reflects a claimant who is closely approaching advanced age and possesses a post high school education. (R. at 53) Mr. Panza described the Plaintiff's employment history as that of a financial advisor and sales manager, both of which are jobs that are considered light and skilled work. (R. at 54) In regard to the Plaintiff's ability to do his past relevant work, Mr. Panza gave the following testimony:

> Q.   All right. I want you to assume that the claimant would be limited to doing light work. Wouldn't be able to do any overhead reaching with his right, upper extremity, wouldn't be able to lift more than ten pounds on an occasional basis with his right upper extremity, would be limited to only occasional postural movements such as stooping, kneeling, wouldn't be able to climb any ladders, ropes or scaffolds. Would only be able to occasionally climb ramps or stairs. Wouldn't be able to work in extremes of cold temperatures for long periods of time which I define as more than an hour. Wouldn't be able to work in any unprotected heights or around dangerous moving machinery. Would he be able to do his past relevant work with those limitations?

Q.      Yes, Your Honor.

Q.      I want you to assume that the claimant would be limited to doing sedentary
        work.  Would he be able to do any of his past relevant work?

A.      No, Your Honor.

(R. at 53-54, )   The ALJ also questioned Mr. Panza as to the transferability of any skills obtained

from the Plaintiff's past work:

Q.      With respect to the transferability of skills would there be . . . skills that he
        would have obtained from his past relevant work that would transfer to jobs
        that would require only those skills and no other skills at a sedentary level?

. . .

A.      Your Honor, with respect to your questions or your charge to consider the
        individual being limited to sedentary and involving past skills it is possible
        that skills that this individual has could be transferred to some sedentary
        occupations involving those skills.  However, I would suggest, Your Honor,
        there would be a moderate amount of adjustment necessary to adjust to the
        jobs that I am going to mention.

Q.      Okay.

A.      At the sedentary level the position of a clerk, medical claims clerk, insurance
        for which there are at least 155,000 jobs in the national economy, at least
        1,200 in the state of West Virginia and also the position of an adjustment
        clerk in regular insurance claims 536,000 jobs in the national economy and
        at least 1,100 in the state of West Virginia, consistent with the DOT.

(R. at 55-56)  However, Mr. Panza recognized that these jobs would not be possible for persons

without bilateral, manual dexterity:

Q.      Okay.  At those, and those jobs basically would require the claimant to
        basically use a computer or do a lot of data entry?

A.      Yes.  And it would be a selective type of placement and selective type of

occupational situation to accommodate any limitations similar to that of the claimant.

Q.      So if it was, claimant was further limited to, limited to the extent that they wouldn't, at sedentary wouldn't be able to do jobs that would require him to have bilateral, manual dexterity would that eliminate those jobs?

A.      Yes, Your Honor, I think so.

(R. at 56) The ALJ then continued to question Mr. Panza as to the Plaintiff's ability to perform both his past relevant work, and any other potential work in the national or local economy:

Q.      All right. I want you to assume that the claimant would be limited to doing light work. Would not be able to do jobs that would require him to have, to lift over ten pounds on an occasional basis with his right upper extremity, limiting him to doing simple, routine tasks and allowing him to change position if, he could do a total of six hours of standing or walking in an eight-hour work day but wouldn't be able to stand or walk for more than half hour at a time, then would have to sit down for a few minutes. Wouldn't be able to do any overhead reaching with his right upper extremity and would be limited as I indicated previously about not having to lift more than ten pounds occasional with his right upper extremity. In jobs that would require him to, not require him to work outside in a cold environment, would there be any full time, unskilled jobs t the light level that, well first I guess could he do any of his past relevant work with those limitations?

A.      Yes, Your Honor.

Q.      Okay. And would there be any, would there be any jobs, assuming that he was unable to do his past relevant work could you give me some examples of jobs that a hypothetical individual could do with those limitations at the light level with a sit/stand option?

. . .

A.      Your Honor, considering the last hypothetical you presented ot me for a comment it would be my testimony that jobs would exist at the light level considering the other factors mentioned in your hypothetical. The first one would be that of a door man, security surveillance system monitor operator.

50,000 jobs in the national economy and at least 425 in West Virginia. And also at the light level the position of a ticket seller, 219,000 jobs in the national economy and 600 jobs in the state of West Virginia. Both of the jobs are unskilled and provide for a sit/stand posture performing those jobs.

Q.      All right. I'm going to ask you another hypothetical. I want you to assume a hypothetical individual the same age, educaiton and work experience as the claimant that would have the ability to do light or sedentary work due to the individual's impairments. The individual would be off task either because he had to lay down or otherwise would be unable to fulfill his job functions two hours out of an eight-hour workday. This would be because of his, the effects of his impairments or the effects of the medications that he uses for the impairments. Would there be any full time, unskilled jobs such a hypothetical person could do in the local or national economy with those limitations?

A.      No, Your Honor, no jobs. No jobs.

Q.      The same question with a different limitation. The individual would be limited to light or sedentary work. Would, due to his impairments would be off, absent from work three days a month on an ongoing basis. Would there be any full time unskilled jobs such a hypothetical person could do in the local or national economy with those limitations?

A.      No, Your Honor, no work.

(R. at 56-58)

## F.      Lifestyle Evidence

At the ALJ hearing, the Plaintiff testified that he normally wakes up around 5:30 A.M., fixes himself a cup of coffee, and lets his dog out. (R. at 39) He spends most of his day doing small chores around the house, but usually takes a nap around noon. Id. He can mow his lawn with a self-propelled mower. (R. at 18-19) He washes dishes and does his own laundry, although he needs help changing the fitted sheet on his bed. (R. at 45-46) He can also vacuum his home. (R. at 46) If he

works for more than 45 minutes, he must stop to take a break, which usually involves stretching out on his bed for anywhere from 45 to 90 minutes. (R. at 47) He does his own grocery shopping for small items, but has his neighbor pick up his groceries if he needs a large amount of items. (R. at 44) He allowed his license to expire in 2004 and no longer drives because of the vibration, constant need to move his arm, and because the limited range of motion in his neck makes it hard to see his blind spots. (R. at 19) He used to play tennis, golf, bike, hike, and downhill ski, but after the accident he had to give up those activities. (R. at 43) He does not belong to any fraternal organizations, but does attend church. (R. at 43) He occasionally sees his children, who attend Penn State University. (R. at 43-44)

### III. CONTENTIONS OF THE PARTIES

The Plaintiff, in his motion for summary judgment, alleges that the ALJ's decision should be reversed because it is arbitrary, contrary to law, and unsupported by substantial evidence. (Pl.'s Mot. for Summ. J. 1, ECF No. 12) In support of his motion, the Plaintiff argues that the ALJ improperly rejected the opinion of Dr. Sella by not adopting his recommendation that the Plaintiff be limited to only occasional standing and walking. (Pl.'s Mem. in Supp. of Mot. for Summ. J. 7-13, ECF No. 12) In response, the Defendant argues that substantial evidence supports the ALJ's finding that the Plaintiff could perform a reduced range of light work. (Def.'s Mem. in Supp. of Mot. for Summ. J. 9, ECF No. 13) The Defendant further argues that:

1. The ALJ appropriately evaluated Dr. Sella's opinion under the regulations; (Def.'s Mem. 9)

2. The ALJ was not obligated to adopt Dr. Sella's functional limitations in their entirety

when crafting the RFC assessment; and (Def.'s Mem. 10)

3.      Even with additional limitations, the record supports a finding that the Plaintiff could perform his past relevant work.  (Def.'s Mem. 13)

## IV.  STANDARD OF REVIEW

The Fourth Circuit applies the following standards in reviewing the decision of an ALJ in

a Social Security disability case:

> Judicial review of a final decision regarding disability benefits . . . is limited to determining whether the findings . . . are supported by substantial evidence and whether the correct law was applied.  See 42 U.S.C. § 405(g) ( "The findings . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); Richardson v. Perales, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).  The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable person might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401, 91 S. Ct. at 1427 (citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 216 (1938)) . . . . If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."  Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).  Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment . . . if the decision is supported by substantial evidence.  See  Laws v. Celebrezze, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962).

Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Because review is limited to whether there

is substantial evidence to support the ALJ's conclusion, "[t]his Court does not find facts or try the

case de novo when reviewing disability determinations."  Seacrist v. Weinberger, 538 F.2d 1054,

1056-57 (4th Cir. 1976).   Furthermore, **"the language of § 205(g) . . . requires that the court**

**uphold the decision even should the court disagree with such decision as long as it is supported**

**by 'substantial evidence.'"** Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (emphasis

added).

# V. DISCUSSION

A.    Standard for Disability and the Five-Step Evaluation Process

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work . . . . "[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

See 42 U.S.C. § 423(d)(2)(A).  The Social Security Administration uses the following five-step

sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any.  If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s).  If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s).  If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functional capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . . ."
20 C.F.R. § 404.1520.]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work.  If you can still do your past relevant work, we

will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520. If the claimant is determined to be disabled or not disabled at any of the five steps, the process does not proceed to the next step. Id.

B.     The Decision of the Administrative Law Judge

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

**1.     The claimant has not engaged in substantial gainful activity since October 5, 2006, the application date (20 CFR 416.920(b) and 416.971 *et seq.*).** (R. at 67)

**2.     The claimant has the following severe impairments :status post C6-7 microdiscectomy and interbody fusion; degenerative disc disease of the cervical spine; C6-7 radiculopathy; and carpal tunnel syndrome (20 CFR 416.920(c)). All other conditions are nonsevere but will be considered with the severe impairments.** (R. at 67)

**3.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).** (R. at 67)

**4.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) with no overhead reaching with the right upper extremity; no lifting of more than 10 pounds on an occasional basis with the right upper extremity; only occasional stooping, kneeling, and climbing of ramps and stairs; no climbing of ladders, ropes or scaffolds; no exposure to extremes of cold temperature for long periods (more than one hour); no work at unprotected heights or around dangerous moving machinery.** (R. at 67-68)

**5.    The claimant is capable of performing past relevant work as a financial advisor and sales manager.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 416.965).**  (R. at 71)

**6.    The claimant has not been under a disability, as defined in the Social Security Act, since October 5, 2006 (20 CFR 416.920(f)), the date the application was filed.**  (R. at 71)

C.    <u>The ALJ's Step Four Determination Is Not Supported by Substantial Evidence</u>

As his sole ground for challenging the ALJ's decision, the Plaintiff argues that the ALJ's RFC finding is not supported by substantial evidence because the decision fails to reconcile the ALJ's statement that he assigned great weight to Dr. Sella's opinion with his finding that the Plaintiff could perform a reduced range of light work.  (Pl.'s Mem. in Supp. 7, ECF No. 12)  The Plaintiff further argues that Dr. Sella's opinion that the Plaintiff "can stand occasionally and walk occasionally" is inconsistent with the definition of light work given in the Social Security regulations.  <u>Id.</u>  The Defendant contends that the ALJ properly evaluated Dr. Sella's opinion, that the ALJ was not required to accepted Dr. Sella's findings verbatim, and that other evidence in the record supports the ALJ's decision that he could perform his past relevant work.  (Def.'s Mem. in Supp. of Mot. for Summ. J. 9-14, ECF No. 13)

The residual functional capacity of a claimant is evaluated based "on all the relevant evidence in your case record."  20 C.F.R. § 404.1520(a) (2010).  The RFC assessment is a function-by-function assessment of an individual's ability to do work-related activities that represents "not the *least* an individual can do despite his or her limitations or restrictions, but the *most*."  SSR 96-8p, 1996 WL 374184, at *1, 3 (July 2, 1996); <u>see also</u> 20 C.F.R. § 416.945(a).  In making the RFC

assessment, the ALJ must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis, describe the maximum amount of each work-related activity the individual can perform based on the evidence in the case record, and "must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996). Failure to explain inconsistencies and ambiguities between the evidence and RFC determination is grounds for remand. See Giddings v. Astrue, 333 F.App'x 649, 2009 WL 1813741, at *5 (2d Cir. 2009).

After comparing the opinion evidence cited by the ALJ to the definitions of the physical exertion requirements provided in the regulations and discussed in SSR 83-10, the undersigned Magistrate Judge finds that the ALJ's RFC determination is not supported by substantial evidence. The ALJ gave "great weight" to Dr. Sella's opinion that the Plaintiff "could sit and could stand **occasionally** . . ."[3] (R. at 70-71) (emphasis added) However, "light work" requires "**a good deal of** walking or standing," 20 C.F.R. § 416.967(b) (emphasis added), which, according to Dr. Sella's opinion, is considerably more walking or standing than the Plaintiff is capable of doing. As noted by the Plaintiff, the term "occasionally" is primarily associated with sedentary exertional requirements, and involves standing or walking for only two hours total per eight-hour work day. See SSR 83-10, 1983 WL 31251, at *5 (1983) ("Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than

---

[3] The Court notes that the ALJ's opinion in this regard misstates the actual opinion offered by Dr. Sella, who opined that the Plaintiff "can sit. He can stand occasionally and walk occasionally." (R. at 180)

2 hours of an 8-hour workday, and sitting should generally total 6 hours of an 8-hour workday."). This length of time is much shorter than the six hours of walking or standing required for light work. See SSR 83-10, 1983 WL 31251, at *6 (1983) (" the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday"); see also Alford v. Sec'y, Health and Human Servs., 831 F.2d 1063, 1987 WL 38860, at *4 (6th Cir. 1987) (per curiam) (unpublished table decision) ("Thus, because the medium work definition incorporates the definition for light work, an individual found capable of performing a full range of medium work must have the ability to do 'a good deal of walking or standing,' which, according to Social Security Ruling 83-10, means standing or walking, on and off, for roughly six hours out of an eight-hour day."). The undersigned Magistrate Judge agrees with the Plaintiff that the ALJ cited with approval Dr. Sella's opinion that the Plaintiff could sit and stand occasionally, but failed to explain how this evidence is consistent with a "light work" RFC rather than a "sedentary work" RFC.[4]  Therefore, the undersigned Magistrate Judge finds that the ALJ's RFC determination is not supported by substantial evidence.

## VI.  RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying Plaintiff's application for Supplemental Security Income is not supported by substantial evidence.

---

[4] Additionally, the undersigned Magistrate Judge finds that the ALJ failed to explain the inconsistency between Dr. Sella's opinion and the opinions of the State agency medical consultants, who opined that the claimant could perform work at the light exertional level.  (R. at 71)  The ALJ also failed to explain how his RFC finding that the Plaintiff could lift 10 pounds occasionally with his right upper extremity is consistent with Dr. Sella's opinion that the Plaintiff "would be unable to carry almost anything with his right upper limb."  (R. at 70)

Accordingly, I **RECOMMEND** that the Defendant's Motion for Summary Judgment (ECF No. 13) be **DENIED** and the Plaintiff's Motion for Summary Judgment (ECF No. 12) be **GRANTED IN PART** by reversing the Secretary's decision under sentence four of 42 U.S.C. § 405(g), with remand of the matter to the Secretary for further proceedings consistent with this Report and Recommendation. I **FURTHER RECOMMEND** that, on remand, the Secretary be directed to clarify his reasons for finding that the Plaintiff has the residual functional capacity to perform light work and explain how Dr. Sella's opinion is consistent with that RFC determination.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this **14th** day of **January**, **2010**.

DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE